**AFFIDAVIT OF SPECIAL AGENT GARETT TROMBLY IN SUPPORT OF
AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Garett Trombly being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2011.  My primary duties at the FBI have included investigations concerning foreign bribery, public corruption, economic crimes, and violent crimes.

2.  I make this affidavit in support of a criminal complaint charging JOSEPH BAPTISTE ("BAPTISTE") with conspiring, in violation of Title 18, United States Code, Section 371, to commit crimes against the United States, specifically:  (1) being a domestic concern, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised,  directly or indirectly, to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendant BAPTISTE, and others, in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2 (the Foreign Corrupt Practices Act); and (2) to transport, transmit, or transfer funds from a place in the United States to or through the Republic of Haiti

with the intent to promote the bribery of a foreign government official, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(h).

3. The facts in this affidavit come from my personal involvement in this investigation, conversations with others on the investigative team, my review of documents and records, and my training and experience. In this affidavit, I have not included every fact known to me about this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause.

## BACKGROUND

4. BAPTISTE is a United States citizen and resident of Maryland. He is a retired colonel in the United States Army and a practicing dentist. At times relevant to the events described herein, BAPTISTE served as the president of an entity headquartered in Maryland that purported to be a non-profit organization with the stated mission of helping the impoverished in the Republic of Haiti ("Maryland Non-Profit 1"). Maryland Non-Profit 1 had tax exempt status under Section 501(c)(3) of the Internal Revenue Code.

5. BAPTISTE also served as a member of the board of directors of "Company A," a limited liability company organized under the laws of Delaware.

6. "Individual A" was a United States citizen and the Chairman and Chief Executive Officer of Company A. According to a 2013 prospectus, Company A's mission was to promote a port development project (the "Port Project") in an area of Haiti known as Moles Saint Nicolas. The prospectus described the Port Project as involving numerous "modular" phases, including the construction of multiple cement factories, a shipping-vessel recycling station, an international transshipment station with numerous slips for shipping vessels, a power plant, a petroleum depot, and tourist facilities.

7. "Foreign Official 1" was a high-level elected official of the government of Haiti.

8. "Aide 1" was an aide to Foreign Official 1.

## PROBABLE CAUSE

9. In or about August 2014, the FBI began investigating certain Haitian-American businessmen who were offering to facilitate bribes to high-level officials of the government of Haiti, in exchange for the ability to obtain or retain business in that country. During the investigation, BAPTISTE solicited bribes from an undercover agent of the FBI, purportedly to be paid to Haitian government officials in connection with certain infrastructure projects in Haiti—including a mining project and the Port Project.

10. In or about November 2014, the FBI introduced an undercover agent ("UC-1") to BAPTISTE. UC-1 purported to be a potential investor in infrastructure projects in Haiti. On or about November 13, 2014, BAPTISTE flew from Baltimore-Washington International Airport to Boston Logan Airport to attend a meeting with UC-1 that same day at a Boston-area hotel. Over the course of the multi-hour, consensually recorded meeting, BAPTISTE promoted the Port Project to UC-1 and described BAPTISTE'S background in Haitian development projects. Among other things, BAPTISTE discussed a possible investment by UC-1 in the Port Project, told UC-1 that a "pay-to-play" system existed in Haiti, and described bribe payments that would have to be made in connection with the Port Project, as well as how they could be made. BAPTISTE explained that he could use Maryland Non-Profit 1 to conceal and facilitate bribe payments to Haitian officials.

11. During the meeting described in Paragraph 10, BAPTISTE made the following statements, among others, to UC-1:[1]

  a. BAPTISTE said he could introduce UC-1 to top-level Haitian government officials, and stated: "Just take a date you want to go . . . we'll all go together, make your appointments, meet with the [high-level Haitian government officials] . . . and do whatever we have to do. . . ."

  b. When asked by UC-1 if a "pay-to-play" system existed in Haiti, BAPTISTE said: "I would say this, like, we're tipping them to do the right thing, it's like a tip."

  c. BAPTISTE described the language typically used for payments to officials in Haiti on projects like the Port Project as "expenses."

  d. BAPTISTE warned UC-1 of government scrutiny and the need to provide accounting and paperwork to conceal the payments to government officials. He stated: "That's right . . . you just do the consulting group and the consulting group will make sure that everybody has been taken care of . . . . Because again, legally your company . . . cannot get involved with that . . . because whenever you get [the] U.S. involved . . . you gotta lot of scrutiny and you don't want to have any kinds of problems with the U.S. government or anybody."

  e. BAPTISTE described generally how he could facilitate payments to Haitian officials to obtain their support for his business interests, by giving an example involving a $100,000 donation, where $80,000 would be used to build a school, while the remaining $20,000 would be used to pay the official. He said: "We have [an]other non-profit organization that we can use as a . . . like a senator, by example . . . has a pet project and [the] non-profit organization can say, ok, I would fund that project for you . . . . you want a football field, ok, we'll fund it for you, how much will that cost, so through that non-profit organization we can actually write the check to that . . . that's all it is. You gonna build a school, you call the senator to call the deputy or somebody in charge of the area: that's what I'm gonna build for you, for the children, for the kids and everything else . . . the politician [is] happy because they're gonna get credit for it." He added: "Let's say it gonna cost hundred thousand dollars to do the school building . . . a hundred thousand dollars, maybe they spend eighty thousand out of

---

[1] Unless set forth in quotation marks, the statements described in this Affidavit are set forth in sum and in substance. Quotations are excerpts based on draft transcripts of recordings and court-authorized wiretap interceptions made during this investigation.

        [the] hundred, who cares? . . . [A]t least you gonna have a school building . . . to show that something that you donated to the community."

f.     In describing the size of the payments to Haitian officials necessary to secure their support, BAPTISTE said: "When we do our business . . . there's ten percent that is involved in expenses within that budget to take care of all what you are talking about, in other words . . . between ten to fifteen, it's negotiable . . . it's negotiable because remember we have to take care of a lot of people on the ground."

g.     BAPTISTE further described the techniques he had used in the past and would use again with UC-1 to conceal the payments to government officials. He said the money would be put "in an account, in the banking, check, whatever . . . [we give] a receipt and everything else . . . what has been done and so on up-front of the expense . . . because we have to give you a report — remember, this is a U.S. . . . style of . . . doing business . . . . So we cannot go back any other way than doing it right . . . however, as a non-profit in Haiti we have a little leeway to do what we talk about . . . . [B]ut as far as the business . . . is concerned, we all go with . . . whatever numbers is decided."

h.     BAPTISTE offered to use Maryland Non-Profit 1 as a vehicle for payments from UC-1 to Haitian government officials. He said: "The [Maryland Non-Profit 1] group, I think, is quicker and easier because we do a lot of non-profit investment in Haiti . . . we do water . . . we involved in the cholera issue . . . we're gonna provide that to the people, to the elected officials to take care of their people . . . and that is what they are looking for . . . [Maryland Non-Profit 1] take[s] care of all the work; we take care of the ground and the people . . . everybody."

i.     BAPTISTE described two prior instances in which he had helped make payments to Haitian government officials to obtain a license to operate in Haiti. The first was with a telecommunications company for which BAPTISTE indicated that he and his affiliates had secured a license to build a cellular network in Haiti, and which BAPTISTE had earlier described to UC-1 as one of BAPTISTE'S most successful personal investments. BAPTISTE said he had used a Haitian company to facilitate payments to government officials for the telecommunications deal, much in the same way he was offering UC-1 the ability to use Maryland Non-Profit 1to facilitate payments to government officials in connection with UC-1's investment in the Port Project. BAPTISTE went on to describe setting up a company known as PromoCapital to enable a power company to develop a power plant in Haiti. BAPTISTE contended that Maryland Non-Profit 1was involved in facilitating payments for the power plant project.

12. Based on my training and experience, I believe BAPTISTE was describing to UC-1 prior instances in which BAPTISTE participated in the payment of bribes to Haitian government officials, as well as offering to help UC-1 make payments to sitting Haitian government officials to promote the success of the Port Project. For example, when BAPTISTE said that they would be giving people "a tip," I believe that he was referring to paying bribes to Haitian government officials. I believe that when BAPTISTE discussed giving a $100,000 donation to build a school, but spending only $80,000 to build the school, he was giving an example of how to funnel a bribe – the remaining $20,000 – to a government official. Furthermore, when BAPTISTE referred to his business as paying 10 to 15 percent of a project's budget to "take care of a lot of people on the ground," I understand him to have been proposing using 10 to 15 percent of the Port Project's budget to pay bribes to win the Port Project.

13. On or about August 13, 2015, BAPTISTE called UC-1. The call was consensually recorded. BAPTISTE and UC-1 discussed plans for an in-person meeting in Boston, Massachusetts on November 12, 2015, to review details of the Port Project with Individual A, whom BAPTISTE identified as his "money guy."

14. On or about October 7, 2015, UC-1 sent a set of questions about the Port Project to BAPTISTE via email. The next day, UC-1 received an email from Individual A responding to the questions UC-1 had sent to BAPTISTE. In his email, Individual A described various aspects of the Port Project's finances, including its "modular" format and various avenues for investment. Individual A attached additional marketing materials, as well as pro forma financials for a cement factory, which he described as the phase of the Port Project closest to realization. Individual A also advised UC-1 that "[w]e have been assured officially by all the

relevant Haitian authorities that all permits required will be granted speedily. The official letters are available should you wish to verify them."

15. On or about October 9, 2015, UC-1 replied to Individual A and requested copies of the official letters regarding the permits for the Port Project that Individual A had referenced. On or about October 10, 2015, Individual A replied to UC-1 and provided three letters from Haitian officials, including a letter signed by the individual who previously held the position held by Foreign Official 1. The letters contained assurances that the Port Project would enjoy the support of the Haitian government.

16. On or about November 12, 2015, BAPTISTE, Individual A, and a third individual ("Individual B") met at a Boston hotel with UC-1 and a second undercover agent of the FBI, UC-2, who was introduced as UC-1's boss (collectively, the "UCs"). At the meeting, BAPTISTE and his associates spoke to the UCs about the Port Project, and solicited the UCs to invest in a cement factory that would constitute the first phase of the project, which they said would cost $84 million. BAPTISTE told the UCs, in sum and substance, that bribe payments would need to be made to high-level officials of the Haitian government in order to secure Haitian government approval of the Port Project. The UCs discussed with BAPTISTE how his non-profit organization, Maryland Non-Profit 1, could be used to facilitate the bribe payments. BAPTISTE agreed to provide the UCs with the banking information for Maryland Non-Profit 1 via email. In addition, as a show of his access to prominent officials in Haiti, BAPTISTE displayed on his cellular phone an email from two American political consultants whose services he was apparently marketing to a candidate for the Haitian presidency.

17. Thereafter, while in a car en route from the meeting site to Boston Logan Airport, BAPTISTE placed a call to a Haitian cellular telephone number. The call, which was intercepted

and monitored by the FBI pursuant to court authorization, was forwarded to voicemail. Based upon the voicemail greeting that was intercepted, I believe the number was that of Foreign Official 1. BAPTISTE left a message requesting that Foreign Official 1 call him back.

18. On or about November 16, 2015, BAPTISTE told UC-2 that he was traveling to Haiti specifically in connection with the Port Project, and that he was going to meet with Foreign Official 1 to obtain an updated letter of support for the Port Project. When UC-2 asked BAPTISTE if BAPTISTE needed anything from UC-2, BAPTISTE responded that UC-2 needed to wire him money as soon as possible. BAPTISTE sent UC-2 an email in which he provided the account and routing numbers for BAPTISTE's Maryland Non-Profit 1 account at Citibank, so that UC-2 could wire money to BAPTISTE that he could use to pay bribes to obtain an updated letter of support from Foreign Official 1.

19. In a telephone call on or about November 20, 2015, UC-2 discussed with BAPTISTE his plans to obtain a letter from Foreign Official 1 of Haiti supporting the Port Project. During the call, BAPTISTE requested that UC-2 send a previously agreed-upon payment of $25,000, which BAPTISTE said he intended to use to secure Foreign Official 1's support. The following is an excerpt from the conversation:

> UC-2:      OK, and would all the money that I . . . that I wire to you . . . would it all go to [Foreign Official 1] or only part of it?
>
> BAPTISTE:  I would say all of it.
>
> UC-2:      OK, so all the . . . so if wire you 20 . . . if I wire 25,000 to [Maryland Non-Profit 1] it will all go to [Foreign Official 1]?
>
> BAPTISTE:  All going to be . . . yes, uh-huh.

| | | |
|---|---|---|
| UC-2: | | OK, and then, uh . . . you're not . . . it . . . will he do those letters without the money? He . . . or does he have to have that money? |
| BAPTISTE: | | I think he has to have it. |

20. Later that morning, BAPTISTE sent a photograph of himself with Foreign Official 1 to UC-2 via text message, and separately via email.

21. That same day, pursuant to instructions provided by BAPTISTE, the FBI wired $25,000 to a Citibank account in the name of Maryland Non-Profit 1, BAPTISTE's non-profit organization. Thereafter, in a call at approximately 5:15 p.m. EST, BAPTISTE confirmed that he had received the money, but had not yet given it to Foreign Official 1, because he explained, in sum and in substance, that Foreign Official 1 preferred to receive a full bribe payment of $50,000 all at once, rather than by installments. BAPTISTE further explained that he expected to give the money to Foreign Official 1 in U.S. dollars, and in cash, because Foreign Official 1 did not want the money to be traceable. Because BAPTISTE planned to return to the United States prior to receiving the next payment of $25,000 from UC-2, BAPTISTE explained that a close relative of BAPTISTE would receive the money in Haiti in his stead, and would make the payment to Foreign Official 1.

22. On or about November 21, 2015, Individual A called BAPTISTE and left a voicemail in which he asked BAPTISTE to "please let me know whether you got the letter or not. Send me an email or an SMS." The call was intercepted and monitored by the FBI pursuant to court authorization. I believe that Individual A was requesting that BAPTISTE update him, either by text message or email, as to whether BAPTISTE had succeeded in obtaining the letter of support for the Port Project from Foreign Official 1.

23.     On or about November 25, 2015, BAPTISTE called Individual A.  The call was intercepted and monitored by the FBI.  BAPTISTE told Individual A that he had spoken to Aide 1 and inquired whether it was prudent to suggest to Aide 1 that Aide 1 would also be compensated if Foreign Official 1 authorized the Port Project.  Individual A agreed that this was a good idea.

24.     On or about November 25, 2015, BAPTISTE called Aide 1, asked if he had received everything, and said that BAPTISTE and Individual A had talked about making Aide 1 an engineer on the Port Project if Aide 1 could help obtain Foreign Official 1's authorization for the project.

25.     On or about the evening of December 3, 2015, UC-2 called BAPTISTE and asked for an update.  BAPTISTE replied, in substance, that he was checking on the letter but not getting answers, so he intended to travel to Haiti personally on Sunday, December 6, to look into the situation.  BAPTISTE told UC-2, "these guys, they want more money."  BAPTISTE explained that Foreign Official 1 had referred him to his advisor on infrastructure, an engineer with whom BAPTISTE was acquainted, who had, in turn, forwarded the letter to a lawyer for review.  BAPTISTE explained that each of these individuals wanted money and that he had already made "24, 25" in "advances" to them.  He said:  "For [Foreign Official 1], I kind of give him something else.  I told him that we definitely going to have this project going, and I'm gonna put him as my advisor as well as . . . because he's no longer gonna be in office, so I'm gonna have him as one of my advisors, so he's gonna be on the payroll.  Because this is what we gonna work with, and he agree with that."  BAPTISTE added that "the people that is under him, that's the one that we have to grease the thing to get them going."  BAPTISTE said he had paid $5,000 to Foreign Official 1's first assistant; $10,000 to Foreign Official 1's second assistant; and

$10,000 to a lawyer.  BAPTISTE said he had made these payments in cash, but that they amounted to only half of what BAPTISTE had promised the staffers for their efforts.  BAPTISTE requested that UC-2 send him another $25,000 to complete the payments, and said he would send UC-2 documentation from Maryland Non-Profit 1, BAPTISTE's non-profit organization, so that UC-2 could obtain a tax deduction for the money he had already sent to Baptiste that would be used to bribe government officials in Haiti.

   26. On or about December 4, 2015, BAPTISTE sent an email to UC-2.  Attached to the email was a scan of a letter on Maryland Non-Profit 1 letterhead, signed by BAPTISTE, which reads:

> Mr. [UC-2]
> [UC Investment Firm Name]
>
> On behalf of the [Maryland Non-Profit 1] Board, our members, and the people in Haiti, I would like to thank you and [UC Investment Firm Name] for your dedication and unselfish support.  Your compassion, devotion and kindness in helping the unfortunate Haitians are well noted.
>
> [Maryland Non-Profit 1…] is a 501C3 tax exempt organization ID # [XX-XXXXXXX] with the noble mission in helping the impoverished in Haiti, our efforts have been met with several challenges, be assured, your generous donation of $25,000.00 will go directly to help the undeserved [sic] and the [Maryland Non-Profit 1] ongoing medical efforts that will enable us to save more lives.
>
> Your kindness during these difficult times will never be forgotten.
>
> May God bless you.
>
> Respectfully
> [signature]
> Dr. Joseph E. BAPTISTE Col. USAR
> Chairman [Maryland Non-Profit 1]

27. On or about December 8, 2015, BAPTISTE told UC-2 during a telephone call that he had obtained an updated letter of support from Foreign Official 1 in exchange for bribes that BAPTISTE had paid.

28. On or about December 9, 2015, Individual A emailed the updated letter of support to UC-2. The letter was dated December 4, 2015 and signed by Foreign Official 1.

29. On or about December 10, 2015, after UC-2 wired an additional $25,000 to the Maryland Non-Profit 1 bank account, BAPTISTE sent UC-2 by email another letter from Maryland Non-Profit 1 falsely describing the second $25,000 payment as a charitable, tax deductible donation.

30. I have reviewed bank records indicating that BAPTISTE ultimately used the $50,000 that UC-2 wired to Maryland Non-Profit 1's bank account for personal purposes.

31. I have reviewed a sworn declaration, signed by BAPTISTE under penalty of perjury, in which he affirmed that although he used the money he received from UC-2 for personal purposes, he intended to use future payments from UC-2 to make bribe payments in connection with the Port Project.[2]

---

[2] On or about December 29, 2015, BAPTISTE was approached by federal agents. Thereafter, BAPTISTE, who was represented by a criminal defense attorney, entered into a plea agreement with the government pursuant to which he agreed to waive indictment and plead guilty to an information charging him with conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act and the Travel Act, in violation of Title 18, United States Code, Section 371. BAPTISTE signed the sworn declaration in connection with the plea agreement. More recently, BAPTISTE has indicated, through counsel, that he does not intend to honor his plea agreement or to plead guilty.

**CONCLUSION**

32. Accordingly, based on my knowledge, training and experience and the facts set forth in this affidavit, I have probable cause to believe and I do believe that JOSEPH BAPTISTE conspired, in violation of Title 18, United States Code, Section 371, to commit crimes against the United States, specifically: (1) being a domestic concern, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised, directly or indirectly, to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendant BAPTISTE, and others, in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2; and (2) to transport, transmit, or transfer funds from a place in the United States to or through the Republic

of Haiti with the intent to promote the bribery of a foreign government official, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956 (h).

Sworn to under the pains and penalties of perjury.

_____
Garett Trombly
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me August 28, 2017

_____
The Honorable M. Page Kelley
United States Magistrate Judge