## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH BAPTISTE<br><br>and<br><br>ROGER RICHARD BONCY<br><br>Defendants | No. 17-cr-10305-ADB |

### GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Three years ago, Defendant Roger Richard Boncy moved to dismiss the Superseding Indictment based on the government's loss of two recordings. At an evidentiary hearing, a government witness described how the government tried to recover the lost recordings by extracting audio files from a government office computer that had failed, but found nothing in the files. They were empty or contained white noise with no discernable relationship to the investigation of this case. The Court denied Boncy's motion, finding that the loss of evidence was not intentional and, as a result, "dismissal [was] not an appropriate remedy." Mem & Order at 2 (ECF 181). The Court also did not find that the lost recordings were exculpatory. *Id*. ("[T]he Court is unable to conclude based on the evidence presented whether the Recordings were exculpatory."). That is the law of the case.

Nevertheless, Boncy, joined by his co-defendant, Joseph Baptiste, now moves to dismiss the Superseding Indictment because the government did not preserve the disk of junk audio files. ECF 372 and 380. Their motion is meritless. Contentless files, with no known relationship to this

case, are not discoverable under Federal Rule of Criminal Procedure 16 and are not exculpatory in any way.  There is no basis for dismissal, and the Court should deny the motion.[1]

## RELEVANT BACKGROUND

On December 19, 2015, in furtherance of a conspiracy to bribe Haitian government officials to influence decisions and obtain business advantages related to an infrastructure project in Haiti, Boncy had a phone conversation with an FBI undercover agent he believed to be a potential investor in the project.  There is no dispute that the FBI did not preserve the audio recordings of this phone conversation, which occurred during two telephone calls.[2]  The FBI agent who participated on the call could not remember it in detail, and Boncy has declined testify about his recollection of the call.

The Court has already addressed the issue of the December 19, 2015 calls.  In 2019, the defendant moved to dismiss the Superseding Indictment based on the FBI's loss of what Boncy alleged was purportedly exculpatory evidence.  Specifically, Boncy alleged that the call between the FBI and the defendant concerned the issue of whether Boncy and Baptiste would pay bribes in the guise of social or charitable programs.  Boncy argued that any lack of agreement on the method of paying bribes could be exculpatory as to an agreement to pay bribes at all.

The government opposed, arguing, first that the phone conversation could not be exculpatory and second that the loss of the recordings was inadvertent.  First, on the recordings' lack of exculpatory value, the government pointed to evidence of the completed crime of

---

[1] The defendant also seeks as an alternative remedy an evidentiary hearing.  Because defense counsel has already had the opportunity to question the FBI on these very same issues in an evidentiary hearing prior to the first trial and because the disk of contentless audio files is in no way exculpatory, an evidentiary hearing is not necessary.

[2] The defendant correctly notes that this single conversation occurred during two calls on December 19, 2015.  Based on the evidence received at an evidentiary hearing and at trial in 2019, during the conversation, the FBI agent and Boncy briefly lost their connection and had to resume the same conversation some minutes later on a subsequent call.

conspiracy that pre-dated the calls at issue on December 19, 2015.  This evidence was later

admitted at trial and included, among other things, the following exhibits:

> Exhibit 22-1, a call on November 15, 2015, during which Boncy and Baptiste agreed that Baptiste would funnel money to Haitian candidates using Baptiste's charity;

> Exhibit 31-1, a call on November 21, 2015, during which Boncy and Baptiste agreed to hire Haitian Finance Minister Wilson Laleau to ensure he would not block the infrastructure project;

> Exhibit 32-2, a second call on November 21, 2015, during which Boncy stated to Baptiste that they would deal with the Prime Minister or with Finance Minister Laleau and during which Baptiste told Boncy, "Between you and I we put something out to get the letter [of support from the Prime Minister]";

> Exhibit 37-1, a call on November 25, 2015, during which Baptiste and Boncy agreed to bribe an assistant to the Haitian Prime Minister;

> Exhibit 39-1, a subsequent call on November 25, 2015, during which Baptiste offered the Prime Minister's assistant a job and told the assistant that Boncy and Baptiste were also hiring the Prime Minister as a consultant;

> Exhibit 45-1, a call on November 27, 2015, during which Baptiste complained to Boncy that he had to bribe more people than anticipated ("So now I have to go around across the table and get everybody something.");

> Exhibit 47-1, a call on December 1, 2015, during which Baptiste told Boncy that Baptiste had promised the Prime Minister's assistant a cut of the project to get him to help (Baptiste: "I told him if he can do something for us about Mole Saint Nicolas, we will get him involved in it."  Boncy:  "Yes, yes, absolutely.") and during which Baptiste conveyed that the Haitian Finance Minister was going to give him the name of a person who could take a payment;

> Exhibit 50-1, a call on December 3, 2015, during which Baptiste told Boncy, "Each little step it takes each person want[s] . . . a piece," Boncy responded, "Yes, yes, absolutely," and Baptiste stated, "I told [the assistant], once we have the letter [of support from the Prime Minister], we will take care of everybody"; and

> Exhibit 60-1, a call on December 12, 2015, during which Boncy and Baptiste agreed to pay the Haitian Finance Minister $10 million from the infrastructure project and to hire government officials to obtain licenses for the project.

These exhibits all showed that a chargeable conspiracy had already taken place before December

19, 2015.  That bell could not be unrung.

Second, as to recordings of the calls on December 19, 2015, the government described for the Court in an evidentiary hearing in 2019 how the FBI case agent mistakenly failed to download the calls based on an erroneous understanding of an FBI retention policy and how that mistake was irremediable because a local computer that also should have had copies had crashed.

Specifically, during the evidentiary hearing on June 7, 2019, in which defense counsel questioned the undercover agent who participated in the December 19, 2015 calls, the case agent, and the Supervisory Special Agent for the Operational Technology Division in Quantico, VA, the FBI case agent, Garett Trombly, testified as follows regarding his efforts to recover the lost recordings:

> When I first logged in, I attempted to download them.  And when that failed, I went to the local personnel who administer the local version of the system and asked for help. My understanding is that they communicated down to Quantico to have them check if the files were available on their servers. When we got that negative answer, over an ensuing time, I'm not sure precisely when, I learned that, in fact, as supervising Special Agent King testified, a local copy was delivered to the local machine, which we then tried to examine for the calls. That was negative.
>
> But then we found out that the machine in place in 2018 was not the same one that was in 2015.  So we set about trying to find that machine, which we did.  It was shipped back to us from Quantico where it was -- a computer specialist in Boston examined it for all audio files and gave me a disk of those.  I reviewed every one of them, and *there was no fragment or complete record of anything pertaining to this or any other investigation*.

Evid. Hr. Tran. 91 (June 7, 2019) (emphasis added).  Notably, defense counsel did not ask for a copy of the disk reviewed by the agent at the time of the evidentiary hearing or seek it for use at trial.

Following the evidentiary hearing, the Court found that the recordings of the December 19, 2015 calls were inadvertently destroyed by the government.  As such, the Court ruled that dismissal was "not an appropriate remedy." (ECF 181.)  The Court was unable to conclude on the evidence presented whether the recordings were exculpatory.  As such, the Court instructed the jury that if

they found that the government "failed to preserve or destroyed a recording that it knew to be relevant to a contested issue in this case, then you may infer, but you are not required to infer, that the contents of the unpreserved recordings were favorable to the defense." (June 19, 2019 Trial Tr. 26:8-12.)

Following an eight-day trial in June 2019, the jury convicted both defendants of conspiracy to violate the Foreign Corrupt Practices Act (FCPA) and the Travel Act related to a scheme to bribe Haitian government officials. The jury also convicted Baptiste and acquitted Boncy on a substantive Travel Act count and a money laundering conspiracy count.

The Court subsequently granted new trials for both defendants, finding that Baptiste's counsel was ineffective, after which the government appealed, and the First Circuit affirmed the Court's order of a new trial.

On September 15, 2021, the Court set this case for trial on July 5, 2022.

On May 16, 2022, eight months after this case was set for trial and less than two months before trial, Boncy sent the government extensive discovery requests, including requests pertaining to the disk of audio files (the disk which contained "*no fragment or complete record of anything pertaining to this or any other investigation*") and to the government's efforts to recover the lost calls of December 19, 2015.

Thereafter, the government responded to the defendant's discovery requests, producing documents and providing narrative responses regarding the computer that malfunctioned and the FBI's efforts to recover the December 19, 2015 call recordings. The government stated that an FBI computer scientist examined the hard drive of the computer that malfunctioned to identify any audio files that fell within the relevant time period or were the relevant file type, and created a disk

of the 172 recovered audio files,[3] which he provided to an FBI operational support technician.  The FBI operational support technician kept possession of the disk, and with SA Trombly, reviewed the audio files extracted by the FBI computer scientist.  Consistent with SA Trombly's recollection, cited above, the FBI operational support technician recalled the audio files as containing white noise.  Because the disk did not contain any evidence or content, it does not appear a copy of the disk was maintained.  FBI property management disposed of the computer itself on or about October 31, 2019.  As a result, it is not possible to recreate the contents of the disk.[4]

## LEGAL STANDARD

To prevail on a Due Process claim based on lost or destroyed evidence, the defendant must demonstrate both: (1) that the evidence possessed exculpatory value that was apparent *before* it was destroyed or that the government acted in bad faith; and (2) that the evidence was irreplaceable (*i.e.*, that comparable evidence cannot be obtained by other reasonably available means).  *Magraw v. Roden*, 743 F.3d 1, 8 (1st Cir. 2014) ("[The controlling Supreme Court cases] frame a dichotomy between evidence that is apparently exculpatory and evidence that is no more than potentially useful.") (citations omitted); *Olszewski v. Spencer*, 466 F.3d 47, 55-57 (1st Cir. 2006).

The Supreme Court's decisions in *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), and *California v. Trombetta*, 467 U.S. 479, 488-489 (1984), "govern the constitutionality of the nondisclosure of evidence in cases in which the government no longer possesses the disputed evidence." *Olszewski,* 466 F.3d at 55 (internal quotations and citations omitted).  These cases and their progeny, as interpreted in *Olszewski*, demonstrate that a defendant seeking to dismiss

---

[3] There is no indication that any of the 172 recovered audio files are in any way related to this case rather than to another case or that they were not operating system audio files.
[4] The government's communications with counsel on this issue have also included collegial and frank telephone conversations.

6

allegations based on the alleged destruction of evidence bears a heavy burden, a burden which the defendant has not met here.

Notably, the governing standard differs depending on whether the evidence is "apparently exculpatory" or merely "potentially useful." *Olszewski*, 466 F.3d at 56. Therefore, the threshold question is whether the defendant is able to show it was apparent that the evidence was exculpatory before it was destroyed.[5] *Id.* at 56-57. If so, it is not necessary for the defendant to show bad faith on the part of the government. *Id.* But where, as here, the defendant is unable to show that the evidence was "apparently exculpatory," *i.e.*, if he can show only that the evidence is "potentially useful" for the defense, then the defendant must show bad faith on the part of the government. *Id.*; *see also Magraw*, 743 F.3d at 7-8.

## ARGUMENT

In seeking dismissal of the Superseding Indictment, the defendant fails to meet the high threshold burden of demonstrating that empty audio files with no apparent connection to this case were "apparently exculpatory," or that the government acted in bad faith at any time. Additionally, the defendant has never shown with respect to the December 19, 2015 calls themselves that comparable evidence is not available to him by other means.

*First*, in an attempt to give unmerited import to the disk of junk audio files, the defendant attempts to relitigate the potential exculpatory value of the lost call recordings themselves. The defendant argues, as he did previously in 2019, that the calls from December 19, 2015 contained allegedly exculpatory information because the purported disagreement between the defendants that

---

[5] The defense's burden is not met when assertions of exculpatory value of the lost evidence are "merely conclusory" or "based purely on speculation and conjecture." *United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994) (citing *United States v. Martinez*, 744 F.2d 76, 79-80 (10th Cir. 1984)).

7

Boncy may have referenced in his call[6] with the undercover agent undercuts the existence of the conspiracy between the defendants.  That argument must fail—again—because by December 19, 2015, the crime was complete, and as a matter of law, lack of agreement about the details of the execution of a scheme is irrelevant to the existence of an agreement as to the illegal object of the scheme.

The crime of conspiracy "is complete upon the agreement to do an unlawful act as implemented by one or more overt acts."  *United States v. Medina-Garcia*, 918 F.2d 4, 8 (1st Cir. 1990) (quoting *United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987)); see also *United States v. Carter*, 15 F.4th 26, 30 (1st Cir. 2021) (similar).  The government only has to prove agreement on "the essential *nature* of the plan" and does not have to prove that each defendant had "knowledge of all its details or of the participation of others."  *Blumenthal v. United States*, 332 U.S. 539, 557 (1947) (emphasis added).  Agreement in a conspiracy does not have to reach the method of operation, so long as there is agreement about the unlawful object of the conspiracy.

For example, in *Sandoval*, the First Circuit held that it would be improper to suggest that in a RICO conspiracy case, the government not only had to prove that the defendants intended at least two predicate acts but also that they "agreed to the particular manner in which those predicate acts would be committed."  *United States v. Sandoval*, 6 F.4th 63, 99 (1st Cir. 2021).  The First Circuit quoted the trial court's instruction approvingly: "[T]he agreement has to be the specific

---

[6] The defense has sought to portray one of the potential mechanisms discussed by the defendants for concealing *some* of the bribes, namely padding the contract by five percent, as "the heart of the charged conspiracy."  *See, e.g.*, ECF 372 at 8.  Yet, Boncy's own description of the December 19, 2015 conversation with the undercover, in an email he sent to Baptiste and another co-conspirator on December 20, 2015, did not mention any purported disagreement with Baptiste, but instead stated, "As to the 5% Finder's fees, we are looking for a solution but I chose not to raise it with him."  Exhibit 100 (admitted at trial).  Further, numerous communications between Boncy and Baptiste before and after December 19, 2015, discussed in detail in the government's closing argument in the first trial (*see* 6/19/19 Trial Tr. 65-68), cut against the defense theory of a purported disagreement between Boncy and Baptiste.

agreement, in this case, to commit racketeering in such-and-such a way, but you don't have to agree to every detail of the agreement or every detail of how the crimes are going to be committed." *Id*. (citing *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994)); *see also United States v. O'Campo*, 973 F.2d 1015, 1019 (1st Cir. 1992) ("[T]he government need not establish that the defendants knew or agreed upon every detail of the conspiracy." (quoting *United States v. Sanchez*, 917 F.2d 607, 610 (1st Cir. 1990)).

Similarly, in *Tobin*, the First Circuit stressed that because a conspiracy is an inchoate crime, the details of the "scheme need not be fleshed out." *United States v. Tobin*, 480 F.3d 53, 58 (1st Cir. 2007). The court explained, "A drug distribution conspiracy exists once two persons agree to obtain cocaine and distribute it, even if the amount, timing, supplier, price and distribution method are all left open." *Id*. (citation omitted). In other words, a drug conspiracy agreement was live even if the conspirators had not yet agreed on how to execute the scheme.

Here, the evidence is overwhelming that by December 19, 2015, Boncy and Baptiste's crime was complete (albeit continuing). They had agreed to bribe Haitian officials and had taken overt acts in furtherance of the conspiracy. For example, at trial, this Court heard evidence that Baptiste travelled to Haiti to meet with Haitian officials and that, with Boncy's permission, Baptiste offered a job to the Haitian Prime Minister's assistant in exchange for his assistance with a letter of support from the Prime Minister and other support for the defendants' planned infrastructure project. The Court also heard the defendants agree to hire Haitian officials as consultants, and the Court heard about Baptiste's subsequent trip to New York to meet with his purported investor, the undercover FBI agent. All of that happened—conduct proving all the elements of the charged conspiracy—before December 19, 2015. Nothing Boncy said that night could unring the bell. The defendant does not suggest that anything that happened on December

19, 2015 shows that he withdrew from the conspiracy, and in fact, even if he did suggest as much, he cannot make the requisite showing.

Boncy now argues that the government's unsuccessful efforts to recover the audio recordings from the December 19, 2015 calls represents a failure to preserve purportedly exculpatory evidence. That is absurd. The audio files at issue had no content or contained white noise. They had no apparent connection to this or any other investigation. The FBI did not preserve the files because they contained nothing. To be clear, there is no allegation that the government found anything of substance when it examined the computer that malfunctioned. To the contrary, in 2019, the case agent testified under oath, that he found *nothing* in the audio files that were recovered. *Nothing* is neither exculpatory nor potentially useful. It's nothing.

*Second*, the government has acted in good faith at all times. The government does not dispute that the case agent mistakenly failed to download the call recordings from December 19, 2015, based on his erroneous understanding that they were preserved indefinitely on an FBI server, as are calls recorded pursuant to a Title III wiretap order. As this Court has already found, that is not bad faith. That is a mistake.

That the disk containing the audio files with no content or white noise, and with no apparent connection to this case, was not preserved, is also not bad faith. It is commonsense. Such audio files, with no apparent connection to the case, are not exculpatory, material, or potentially useful. *See California v. Trombetta*, 467 U.S. at 489 ("Whatever duty the Constitution imposes on the [government] to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.").

Boncy' reliance on *United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994), is wholly mistaken and misplaced. In *Bohl*, the government failed to preserve steel beams, the chemical composition of which was the central issue in the case. The court concluded that the government acted in bad

faith because, first, defense counsel specifically asked to have access to the steel beams; second, the allegation that the beams had exculpatory value was not conclusory, but rather backed by "objective, independent evidence" giving the government reason to believe that the government's tests of the steel might have been flawed and that further tests might lead to exculpatory evidence; third, the government still possessed the steel beams when it received notice of the steel beams potential exculpatory value; fourth, the evidence was itself central to the government's case; and fifth, the government offered no innocent explanation for the destruction of evidence.  The facts in this case are distinguishable on all points.  First, although defense counsel knew in 2019 that the FBI had tried, unsuccessfully, to recover files from a defective FBI computer, counsel did not ask the government for access to the disk of audio files that the FBI recovered until May 2022. Second, there is no evidence of any kind that any of the junk audio files recovered by the FBI were associated with any case or had any content, let alone content pertinent to any known communication by the defendant.  Boncy's suggestion that audio files of white noise would have exonerated him is conclusory in the extreme.  Third, the FBI believed the disk did not possess any content pertaining to this case—and there is no reason to believe that the files contained any substantive content at all.  Fourth, the junk files on the disk were not central to the case against Boncy.  Indeed, there is no indication that they related to the case against Boncy.  The FBI's handling of audio files containing no content or known connection to this case does not bear on any determinative issue in this case.  And fifth, the FBI's decision not to preserve the disk was innocuous.  The FBI believed that the junk audio files contained nothing but white noise, none of which could be linked to this or any case.  In other words, the FBI did not preserve a disk containing empty files, with no discernable connection to this case.

   *Third*, Boncy cannot show that he lacks comparable evidence of the very things he purports to lack.  Based on records produced in discovery, he knows when the calls happened; he also

knows based on his own admission that during the call on December 19, 2015, the issue of the so-called 5 percent for bribes did not come up in substance.  On Sunday, December 20, 2015, the day after the calls, Boncy wrote an account of his conversation with the undercover the day before.  He wrote nothing regarding any purported disagreement with Baptiste, but he did write, "As to the 5% Finder's fees, we are looking for a solution but I chose not to raise it with him."  Exhibit 100 (admitted at trial).  He also said of the call, "we spoke for about thirty minutes talking about his family and this and that."  Exh. 72-1 (admitted at trial) (Dec. 20, 2015 recorded call between Boncy and Baptiste).  The defendant also has testimony from the undercover agent and a recorded call between the agent and Baptiste about the December 19, 2015 calls.  Moreover, the defendant himself can testify about the call and his purported lack of agreement.  The First Circuit has held that a defendant's testimony about events in which he participated is comparable, replacement evidence, even if the defendant would have to expose himself to cross-examination.  *Cf. United States v. Brimage*, 115 F.3d 73, 77 (1st Cir. 1997).  In *United States v. Esquilin-Montañez*, 268 F. Supp. 3d 314 (D.P.R. 2017), for example, the district court rejected an argument that defendants did not have comparable evidence because they would have to testify and the government would characterize their testimony as self-serving and impeach them.  *Id*. at 317 ("Both points are unavailing.").

Courts in other circuits have reached similar conclusions.  *See, e.g., United States v. Matthews*, 373 F. App'x 386, 391 (4th Cir. 2010) (no due process violation where defendant could obtain comparable evidence of destroyed video from cross-examination of detectives and his "own testimony"); *United States v. Revolorio-Ramo*, 468 F.3d 771, 774-775 (11th Cir. 2006) (no due process violation where defendants could cross examine officers and testify themselves); *United States v. Parker*, 72 F.3d 1444, 1452 (10th Cir. 1995) ("Defendants had a readily available source to replace the missing video tape—[police testimony] and their own testimony of the events.");

*United States v. Hameen*, No. 3:18-cr-115-J-34JBT, 2018 U.S. Dist. LEXIS 210236, at *22 (M.D. Fla. Dec. 13, 2018) (no due process violation where comparable evidence was available through "cross examination of the government's witnesses and the introduction of his own testimony"); *United States v. Wiggins*, No. 1:16-cr-04574-JCH-1, 2018 U.S. Dist. LEXIS 150758, at *19 (D.N.M. Sep. 4, 2018) ("Defendant's own testimony of events is also comparable evidence."). Therefore, even if the defendant could demonstrate governmental bad faith, and he cannot, his motion must fail because comparable evidence about the lost calls is available to him.

## CONCLUSION

For all of these reasons, the defendant cannot show that the junk audio files reviewed by the FBI when seeking to locate the recordings of the December 19, 2015 calls were apparently exculpatory, cannot show that the government acted in bad faith, and cannot show that he does not have comparable evidence available to him for the calls themselves.  Because the defendant has failed to meet the high burden supporting his request for dismissal, the government respectfully requests that the Court deny the defendant's motion to dismiss the Superseding Indictment or for an evidentiary hearing.

Dated: June 21, 2022

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   /s/*Kriss Basil*
KRISS BASIL
Assistant United States Attorney
John Joseph Moakley Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
Tel:  (617) 748-3100
kriss.basil@usdoj.gov

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION

CRIMINAL DIVISION

By:    /s/*Katherine Raut*
        KATHERINE RAUT
        ANTHONY SCARPELLI
        Trial Attorneys
        United States Department of Justice
        1400 New York Avenue, NW
        Washington, D.C. 20005
        Tel:  (202) 262-2637
        katherine.raut@usdoj.gov
        anthony.scarpelli2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/*Katherine Raut*</u>
Katherine Raut
Trial Attorney